## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **HAMILTON SELECT INSURANCE, INC.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 24-2577** |
| | * | |
| **KRAUSE & KINSMAN TRIAL LAWYERS, LLC, ET AL.** | * | **SECTION L(5)** |

### ORDER & REASONS

Before the Court is a Motion for Summary Judgment filed by Plaintiff Hamilton Select Insurance, Inc. ("Hamilton"). R. Doc. 50. Defendant Krause and Kinsman Trial Lawyers, LLC ("KKTL") opposes the motion and filed a Cross Motion for Summary Judgment in its own right, which Hamilton opposes. R. Docs. 53, 54. The parties replied. R. Docs. 57, 63, 64, 67. Oral argument was held on August 20, 2025 at 9:00 A.M. R. Doc. 68. After considering the record, briefing, arguments, and applicable law, the Court now rules as follows.

### I.     BACKGROUND

### A.  The MMA Controversy

The origins of the present insurance coverage dispute between Hamilton and KKTL can be traced back to August 19, 2021—the day that Hurricane Ida struck South Louisiana. R. Doc. 57 at 7. In the wake of the storm's aftermath, a group of attorneys formed the law firm of KKTL in Kansas City, Missouri and began collaborating with Texas-based firm MMA to work on the impending influx of "hurricane cases" in Louisiana. *Id.* at 8. The joint venture between the firms was organized such that MMA would handle all substantive legal matters like client representation and the actual filing of the suits, while KKTL would provide the technological foundation for "[d]ata processing, data collection, automation, client communications, database building, [and] software training for employees." *Id.* Once these details were ironed out and the venture was

1

finalized, the firms began accepting clients who signed a retainer agreement wherein both MMA and KKTL agreed to jointly represent them in connection with their hurricane-related insurance disputes. R. Doc. 1 at 3. The agreement further stated that MMA would receive 75% of the fees, and KKTL would receive 25%. R. Doc. 53 at 8.

Near the end of 2022, Judge James D. Cain of the Western District of Louisiana began to take notice of MMA and KKTL's use of technology in connection with the cases that they were handling in his section and expressed extreme concerns. R. Doc. 57 at 8. On March 4, 2023, Judge Cain conducted a hearing where he temporarily suspended MMA and anyone affiliated with the firm from practicing in the district, specifically denouncing its use of the legal marketing program called Velawcity. *Id.*; R. Doc. 57-7. Shortly thereafter, on March 16, 2023, Magistrate Judge Michael North of the Eastern District of Louisiana issued a similar ruling, detailing the problems with MMA's use of technology:

> When ego and greed become lawyers' guiding principles, we get cases like *Franatovich [v.] Allied Trust*. In these consolidated cases, the Court and the parties—indeed, our entire legal community—are confronted with an unprecedented tableau of misconduct by a Texas-based law firm [MMA], assisted in its misdeeds by an Alabama-based roofing contractor, and an Arizona-based, modern-day case runner [Velawcity].

*Franatovich v. Allied Tr. Ins. Co.*, No. CV 22-2552, 2023 WL 7005861, at *1 (E.D. La. Mar. 16, 2023).

The fallout from these hearings has been severe for MMA. In the subsequent disciplinary proceedings, it was discovered that MMA had, *inter alia*, unlawfully solicited hurricane victims, forged signatures, mishandled client funds, and committed substantial procedural errors by failing to file thousands of valid hurricane coverage dispute claims in Louisiana. In April of 2023, the Louisiana Supreme Court indefinitely suspended the attorneys at MMA from the practice of law

in Louisiana. Despite its obvious connections to MMA, KKTL remained relatively unscathed up until this point but was aware that future litigation arising out of the firms' joint venture was still possible. R. Doc. 53 at 22. It is within this context that KKTL began to engage with the insurance market to procure a legal malpractice policy. *Id.* ("Indeed, a critical reason in procuring the policy . . . [was to] make certain that lawsuits against KKTL arising from MMA's misconduct were covered.").

### B.  Underwriting History Between Hamilton and KKTL

Plaintiff Hamilton is a surplus lines insurer that offers professional liability policies for various professions including engineers, accountants, and lawyers. R. Doc. 50-2 at 3. In the spring of 2023, KKTL purchased a legal malpractice insurance policy from Hamilton for a period spanning from June 4, 2023 to June 4, 2024 (the "23-24 Policy"). *Id.*; R. Doc. 53 at 5. The 23-24 Policy provided coverage for any claim regarding a "wrongful act" arising from KKTL's allegedly inadequate legal services and included a "Multiple Claims Provision" that allowed for future claims sufficiently connected to a claim arising during the policy period to be covered as well. *See id.* at 5.[1] Notably, Hamilton and KKTL did not communicate directly in negotiating the insurance contract. R. Doc. 50-1 at 3. Rather, Hamilton solidified the deal vis-à-vis both KKTL's wholesale insurance broker, Synergy Professional Associates, Inc. ("Synergy"), and its retail broker Assured Partners Northeast, LLC ("Assured Partners").[2] *Id.* at 3-4.

After the 23-24 Policy went into effect, Plaintiff Meco Wagner filed a lawsuit against MMA and KKTL on November 16, 2023, alleging breach of contract and legal malpractice claims

---

[1]    A wrongful act is defined in both the 23-24 Policy and the 24-25 Renewal Policy as "any actual or alleged negligent act, error, or omission." R. Doc. 53 at 5.

[2]    As explained more thoroughly later in this order, Louisiana law and common industry practice appears to require surplus lines insurers to communicate with potential insureds through intermediaries called brokers. *See* LA. REV. STAT. § 22:432.

against both firms for the mishandling of her Hurricane Ida claim (the "Wagner Lawsuit"). R. Doc. 57 at 5. KKTL subsequently notified Hamilton of the Wagner Lawsuit as required by the 23-24 Policy on January 22, 2024, and Hamilton agreed to defend the firm under a reservation of rights. *Id.* It is at this moment that Hamilton contends that it first learned of the MMA Controversy and KKTL's involvement in it. *Id.* at 4. For example, in an email dated January 24, 2024, the claims adjuster assigned to KKTL's policy informed Hamilton's VP Jon Gutleber that she was still researching the firm's connections with MMA and suggested that a claim exclusion provision may be warranted upon renewal of the policy. R. Doc. 53 at 8. Despite this new development, however, Hamilton continued to defend KKTL in the Wagner Lawsuit, which was ultimately dismissed on June 28, 2024. *Id.* at 7.

Thereafter, Hamilton waited until April 2024 to begin inquiring with KKTL's wholesale broker Synergy as to whether the firm was interested in renewing its malpractice insurance for a June 4, 2024 to June 4, 2025 term (the "24-25 Renewal Policy"). R. Doc. 57 at 5. If so, Hamilton informed Synergy that KKTL would have to file a renewal application per company policy. *Id.* Over the next two months, Hamilton alleges that it consistently followed up with Synergy but never received KKTL's application. *Id.* Hamilton nevertheless decided to send KKTL's quote to Synergy via email at 11:59 P.M. on June 4, 2024 providing a copy of the 24-25 Renewal Policy. R. Doc. 53 at 9. The body of the email simply reads: "Please see the renewal terms attached." *Id.*

However, in the email's attached renewal terms that Hamilton refers to as the "binder," the document specifically states throughout: "This endorsement changes the policy. Please read it carefully." R. Doc. 19-1 at 17. Furthermore, the quote that Hamilton provided stated: "Please read carefully as terms and conditions of coverage may differ from those requested." R. Doc. 53-12. This is because Hamilton had made a substantial alteration to the 24-25 Renewal Policy by adding

4

MMA to the list contained in the contract's "Designated Entity Exclusion Schedule" (the "MMA Exclusion").[3] *Id.* Hamilton claims that this change means that under the 24-25 Renewal Policy, it would no longer be required to cover any future legal malpractice claims brought against KKTL "arising out" or "involving in any way" MMA as contemplated in the January 2024 email discussed above. *Id.*; R. Doc. 53 at 8. After sending the renewal terms to Synergy, a period of 36 hours elapsed before Hamilton heard back from KKTL via Synergy with a binder order and a signed application, which finalized the 24-25 Renewal Policy on June 6, 2025. R. Doc. 57 at 5-6.

### C. The Underlying Class Action Lawsuit and Present Declaratory Action in this Court

On or about August 29, 2024, Gayle Heard and fellow Putative Class Representatives (the "Representatives") filed a class action lawsuit against KKTL in Louisiana state court (the "Underlying Class Action Lawsuit") for breach of contract and legal malpractice. R. Doc. 50-2 at 2-3. The Representatives allege that they each signed a contract with both KKTL and MMA wherein both law firms agreed to jointly represent them in connection with their hurricane insurance disputes. *Id.* With respect to KKTL specifically, the Representatives contend that KKTL is equally to blame for the mishandling of their claims because the firm failed to correct MMA's procedural errors or otherwise provide any legal work despite the joint representation contract binding it to do so. R. Doc. 1 at 4. As such, the Representatives request damages in the amount that each class member can prove they would have received from their insurance providers but for MMA and KKTL's actions and/or inaction as well as statutory penalties. R. Doc. 1-3 at 8.

On October 17, 2024, KKTL reported the Representatives' claims against the firm to Hamilton. *Id.* at 6. Upon learning of the suit, however, Hamilton denied coverage to KKTL, stating

---

[3] KKTL has attached an email confirming that Hamilton VP Gutleber instructed the underwriters to add MMA to the Excluded Persons list at 1:46 P.M. on June 4, 2024—the same date that the updated renewal terms were sent to KKTL. R. Doc. 53 at 9.

that the new MMA Exclusion Provision in the 24-25 Renewal Policy exempted it from any duty to cover, defend, or indemnify given MMA was also implicated in the Underlying Class Action Lawsuit. *Id.* KKTL claims that this is the first time it had learned of the MMA Exclusion and alleges that it would have vehemently objected to this alteration if Hamilton had properly informed them of it. *Id.*

In response to this, Hamilton filed the present action in this Court against KKTL and the Representatives for a declaratory judgment pursuant to 28 U.S.C. §§ 2021-2022 and Federal Rule of Civil Procedure 57. R. Doc. 1. It seeks a judicial determination declaring that Hamilton "has no duty to provide coverage, and no duty to cover, defend, or indemnify Krause and Kinsman, under the Policy with respect to the claims asserted against it in the underlying state court litigation." *Id.* On January 2, 2025, KKTL filed its answer and a third-party complaint against its insurance brokers Assured and Synergy for breach of contract and negligence in the event Hamilton's 24-25 Renewal Policy provides no coverage. R. Doc. 23.

## II.    PRESENT MOTIONS

There are two motions presently before this Court. The first is a motion for summary judgment filed by Hamilton, arguing that the MMA Exclusion Provision within the 24-25 Renewal Policy unequivocally precluded it from providing coverage to Defendant KKTL for malpractice claims arising out of or involving MMA. R. Docs. 50, 50-2. In response, KKTL opposes the motion and filed its own cross-motion for summary judgment, arguing that the "Multiple Claims Provision" from the 23-24 Policy requires Hamilton to provide coverage for the state trial involving MMA and that Hamilton failed to properly notify KKTL of a material change in the renewal terms as required by Louisiana law. R. Docs. 53, 54-3. Various parties filed replies. R. Docs. 57, 63, 64, 67.

### III.    APPLICABLE LAW

#### a.  Summary Judgment Standard and Issues of Contract Law

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c*); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if its resolution in favor of one party may affect the outcome of the case. *See Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

The interpretation of an insurance contract is a question of law that is ripe to be decided at this stage in the proceedings. *Am. Totalisator Co. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir. 1993) ("[A] district court's interpretation of a contract is a matter of law reviewable *de novo*."); *see also Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 678 (5th Cir. 2023). However, issues related to the parties' formation of a contract are questions of fact subject to the summary judgment standard and its inferences in favor of the non-moving party. *See, e.g.*, *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 410 (5th Cir. 1996) (holding that whether the parties agreed that a signature would be required to effectuate a contract was a question of fact).

### b. Louisiana Law Applies to the Present Insurance Dispute

A district court sitting in diversity applies the law of the forum state. *Guaranty Nat. Ins. Co. v. Azrock Indus., Inc.,* 211 F.3d 239, 243 (5th Cir. 2000). Louisiana law provides that an issue of conventional obligations, such as the insurance policy in question, "is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." La. Civ. Code Ann. art. 3537. Among the factors courts consider are: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance; (2) the nature, type, and purpose of the contract; and (3) the policies of promoting multistate commercial intercourse. *Id.* Here, the parties do not dispute that Louisiana law governs issues involving both the formation and interpretation of 23-24 Policy and the 24-25 Renewal Policy in this matter.

## IV.    ANALYSIS

Preliminarily, the Court notes that as the party seeking coverage, KKTL bears the burden of proving that Hamilton is required to defend, indemnify, and cover the firm with respect to the Underlying Class Action Lawsuit. *Tunstall v. Stierwald*, 2001-1765 (La. 2/26/02), 809 So. 2d 916, 921 ("In an action under an insurance contract, the insured bears the burden of proving the existence of the policy and coverage."). As such, it is KKTL's responsibility to demonstrate that the facts set forth in the Representatives' petition, "if taken as true, support a claim for which coverage is not unambiguously excluded." *Cmplt. of Stone Pet. Corp.,* 961 F.2d 90, 91 (5th Cir. 1992). The analytical framework governing this inquiry is known as the "eight-corners rule," which requires a comparative assessment between the contractual provisions of the insurance policy at issue and the allegations made in the underlying litigation to ascertain whether any limitations in coverage are applicable and enforceable against the insured. *Vaughn v. Franklin,* No.

2000-0291 (La. App. 1 Cir. 3/28/07), 785 So. 2d 79; *see also Cont'l Cas. Co. v. Smith*, 243 F. Supp. 2d 576, 580 (E.D. La. 2003). In making this determination, the petition is "liberally interpreted." *Id.*

Here, Hamilton argues that KKTL cannot meet its burden because the 24-25 Renewal Policy unambiguously exempts the Underlying Class Action Lawsuit from coverage pursuant to the contract's MMA Exclusion. More specifically, that provision states in pertinent part:

> **THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
>
> This endorsement modifies insurance provided under the following: **PROFESSIONAL LIABILITY**
>
> It is understood and agreed that Section III., EXCLUSIONS, is amended to include the following additional exclusion: Schedule of Excluded Person or Entity
>
> \*\*\*\*
>
> Meco Wagner
>
> McClenny Moseley & Associates, PLLC
>
> \*\*\*\*
>
> This policy does not apply to any "professional services", "claim", "wrongful act", "damages" or "defense costs" based upon, arising out of, or In any way Involving the person or entity named In the Schedule above.

R. Doc. 50-2 at 6 (irrelevant portions of policy language omitted). Drawing upon this language, Hamilton asserts that the allegations made in the Representatives' petition clearly implicate "professional services" or "claims" against KKTL that "arise out of" or "involve" MMA. *Id.* at 10. To be sure, there is no question that KKTL's joint venture with MMA is the focal point of the Underlying Class Action Lawsuit and constitutes the basis of the firm's alleged liability in the case. *Id.* Accordingly, Hamilton maintains its position that the MMA Exclusion Provision operates

to terminate any obligation on its part to cover the Underlying Class Action Lawsuit under the 24-25 Renewal Policy.

Crucially, KKTL has presented no argument in opposition to Hamilton's interpretation of the MMA Exclusion.[4] R. Docs. 53, 54. However, it still maintains that Hamilton is required to cover KKTL in the Underlying Class Action Lawsuit—albeit for different reasons than how Hamilton has framed the issue. *Id.* Specifically, KKTL has presented the Court with two pathways to coverage that are separate and distinct from the simple contractual analysis of the 24-25 Renewal Policy proffered by Hamilton. *Id.* First, KKTL contends that the MMA Exclusion must be entirely read out of the 24-25 Renewal Policy because Hamilton failed to notify the firm of this reduction in coverage during the formation of policy as required by Louisiana law. *Id.* at 17-22. Second, it avers that the Multiple Claims provision in the 23-24 Policy with Hamilton supplies the needed coverage. *Id.* at 13-17. These arguments must be addressed before the Court considers Hamilton's claim that it has no duty whatsoever to cover the Underlying Class Action Lawsuit. The Court assesses each in turn.

### a. Notice Regarding Reduction of Coverage in the Context of Renewal Pursuant to Louisiana Revised Statute § 22:41.1

The Court begins by first addressing KKTL's argument that Hamilton failed to adequately notify the firm of the MMA Exclusion in the context of the parties' renewal negotiations.

### i. Louisiana Law Governing Renewal of Insurance Policies

Under Louisiana law, a policyholder seeking to renew its insurance policy can generally rely on the fact that the renewal will be based upon the same terms and conditions as the earlier policy. *Am. Deposit Ins. Co. v. Myles*, No. 2000-2457 (La. 4/25/07), 783 So. 2d 1282, 1288 ("[A]s

---

[4]    The Court wishes to clarify that its observation here does not constitute a definitive ruling that KKTL has waived its argument with respect to any potential ambiguities in the MMA Exclusion Provision.

a general rule, when a policy is renewed, the same terms and conditions of the prior policy will apply to the renewal policy."). This principle holds true because "[t]he word 'renewal' in the context of insurance has a definite legal meaning." *Gaylord Container Corp. v. CNA Ins. Cos.*, 1999-1795 (La. App. 1 Cir. 4/3/01), 807 So. 2d 864, 873. "Renewal" means "that the original policy shall be repeated in substance and in fact." *Id.* Accordingly, "the failure of an insured to read the contracts of insurance does not relieve the insurer of its duty to call an insured's attention to the changes made to a renewal policy." *Id.* at 875; Rather, "[a]n insured has the right to presume that the policies were issued in accordance with the original policy, until expressly notified to the contrary." *Id.* (citing *Crowell v. N.H. Fire Ins. Co.*, 147 So. 762, 767 (La App. 2 Cir. 1933); *see also McKernan v. ABC Ins. Co.*, 2020-0519 (La. App. 1 Cir. 4/16/21), 324 So. 3d 177, 191; *Ouachita Par. Police Jury v. N. Ins. Co. of N.Y.*, 176 So. 639, 642 (La. Ct. App. 1937).

In order to properly change the terms of an insurance policy on renewal, Louisiana law requires an insurer to call to the policyholder's attention by "written notification" any modifications that materially reduce the coverage available under the renewal policy. LA. REV. STAT. § 22:41.1 ("[I]nsurers shall provide each policyholder with a written notification outlining any reduction in coverage in policy provisions at renewal."). When changes are made without the insured being made aware of the elimination of coverage, at least some Louisiana courts have recognized that a potential remedy after a loss occurs is reformation of the renewal policy to conform with the greater coverage afforded in the earlier policy. *Gaylord Container*, 807 So. 2d at 873 ("Rather, if there is a change in the conditions or terms of the policy, it is the duty of the insurer to call attention to the change; otherwise, the change can be no part of the contract, and the renewal contract is subject to reformation to make it conform to the original contract."); *see also Md. Cas. Co. v. Kramel*, 80 So. 2d 897, 901 (La. Ct. App. 1955). This would mean that such

11

unauthorized alterations do not become a part of the renewal policy, and the insured is not bound by the reduction. *Id.*

Regarding what constitutes adequate notification of reduction in coverage within the context of a renewal of an insurance policy, an insurer cannot simply provide a new policy and instruct the insured to read it. *See Gaylord Container*, 807 So. 2d at 875. As noted above,

> [t]he law does not impose upon the insured under a renewal policy the duty to inspect such renewal policy, and failure of the insured to examine his or her new policy when it was delivered to him or her, which would have led him or her to discover an added clause, does not defeat recovery under the terms of the original policy where the insurer did not inform him or her that the renewal policy would in any way be different from the original.

2 COUCH ON INS., *Inclusion of New Provisions* § 29:42 (3d ed. June 2025 update) (emphasis added); *see also Crowell*, 147 So. at 767 (holding that plaintiff insured "had the right to presume that the policies were issued in accordance with the original policy, until expressly notified to the contrary"). Rather, to satisfy the notice requirement, an insurer must "clearly" and unequivocally call out any reductions in coverage to the insured's attention. *MacLaff, Inc. v. Arch Ins. Co.*, 2007-1182 (La. App. 3 Cir. 2/27/2008), 978 So. 2d 482, 489; *Sims v. Ins. Unlimited of W. Monroe*, 28,234 (La. App. 2 Cir. 2/28/1996), 669 So. 2d 709, 711 ("Insurance policy exclusions are not valid unless clearly communicated to the insured."). This requirement means that an insurer must conspicuously and specifically disclose any reductions in coverage to the insured. *MacLaff*, 978 So. 2d at 489. Indeed, without being properly apprised of the reduced coverage, an insured will

assume the desired coverage exists. *La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So. 2d 1250, 1252 (La. 1993).[5]

With these legal principles in mind, KKTL takes the position that Hamilton cannot rely on the 24-25 Renewal Policy to deny coverage in this case because it failed to adequately notify the firm of the MMA Exclusion upon renewal as required by La. R.S. § 22:41.1. Instead, it asks this Court to reform the policy by excising the MMA Exclusion and thereby obliging Hamilton to cover the Underlying Class Action Lawsuit. However, Hamilton argues that it was merely required to provide the MMA Exclusion in writing and otherwise brought the coverage reduction to KKTL's attention vis-à-vis its communications with the firm's wholesale insurance broker, Synergy. The Court explores the parties' positions in further detail below.

### ii.  La. Rev. Stat. § 22:41.1 Is Applicable

At first instance, the Court finds there to be no question that the written notification requirement for coverage reductions during renewal provided for in La. R.S. § 22:41.1 is applicable to the instant case. It is undisputed that the parties negotiated the 24-25 Renewal Policy as a "renewal" of the 23-24 Policy. R. Doc. 53 at 7. Indeed, Hamilton's underwriter phrased the policy as a "renewal" when they sent the terms of the 24-25 Renewal Policy to Synergy via email. *Id.* Moreover, the 24-25 Renewal Policy includes the "-01 modifier," which constitutes the industry standard signification for a renewal insurance policy. *Id.* This fact is crucial because as explained above, Louisiana law seems to suggest that KKTL, as an insured, may presume the terms of the 24-25 Renewal Policy would remain the same, meaning the firm or its representatives was

---

[5]    The Court notes that the case law cited above concerns the adequacy of communications regarding insurance policy exclusions at the initial negotiation phase and upon delivery. However, the Court finds there to be no reason why these cases are not equally instructive within the context of renewal and La. R.S. § 22:41.1's written notification requirement. Indeed, at least one Louisiana circuit court has similarly imported these general concepts of notice with respect to the scope of coverage and relied upon them in deciding a separate but substantially-similar legal issue, noting that "the legal principle is valid that exclusions or limitations on coverage in a policy should be clearly communicated to the insured at the time of the issuance of the binder." *Sims*, 669 So. 2d at 711.

not necessarily required to read through the entirety of the proposed terms.

As such, it makes logical sense that Hamilton would be obligated to provide clear, written notice of any proposed reductions in coverage, such as the MMA Exclusion, per La. R.S. § 22:41.1. Certainly, the statute provides that all types of insurers—including surplus lines insurers like Hamilton—are subject to the written notice rule for renewal policies with no exception.[6] Therefore, to the extent that Hamilton claims that it was sufficient to merely include the MMA Exclusion in the 24-25 Renewal Policy without specifically bringing it to KKTL's attention, the Court patently rejects such an argument. The case law that Hamilton relies on in support of this position is inapposite and arises out of policy exclusions not subject to La. R.S. § 22:41.1 because they were negotiated at the initial policy formation stage, not the renewal stage. *ASI Lloyds v. Lytell*, 781 F. Supp. 2d 326, 331-32 (E.D. La. 2011); *see also Anton, Ltd. v. Colony Ins. Co.*, No. 11-157 (La. App. 5 Cir. 10/25/11), 77 So. 3d 417, 421-22.

### iii. The Issue of Whether Hamilton Provided Adequate Notice Is Premature and Requires More Discovery

Having established that Hamilton was indeed required to provide written notice regarding any reductions in coverage pursuant to La. R.S. § 22:41.1, the Court now must turn to the question of whether Hamilton's communications in negotiating renewal adequately conveyed the MMA

---

[6]    La. R.S. § 22:41.1's notice requirement does not exempt surplus lines insurers from its requirements, unlike other provisions in Louisiana's Insurance Code. *See, e.g.*, La. Rev. Stat. § 22:1267 ("This Section . . . shall not apply to . . . excess and surplus lines insurance . . ."). As both the U.S. Supreme Court and the Fifth Circuit have held, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972). In turn, the Louisiana Supreme Court has applied this maxim specifically to the Insurance Code. *See Landry v. La. Citizens Prop. Ins. Co.*, 2007-1907 (La. 5/21/08), 983 So. 2d 66, 76 ("Had the legislature intended the statute to apply to policies other than those fire policies providing coverage for fire losses, it could have easily used different language, as it did in La. R.S. 22:667(A)."). Here, that maxim operates such that the Louisiana legislature knew how to exempt surplus lines insurers from certain requirements, as it did explicitly in La. R.S. § 22:1267, but chose not to do so in La. R.S. § 22:41.1. Consequently, that legislative choice demonstrates that surplus lines insurers are not exempt from the requirement to "provide each policyholder with a written notification outlining any reduction in coverage in policy provisions at renewal." La. Rev. Stat. § 22:41.1.

Exclusion to KKTL. On this point, KTTL suggests that Hamilton strategically buried the proposed change in an excess of documents and deliberately sent the renewal terms at 11:59 P.M. on the day before the 23-24 Policy was set to expire in order to evade detection and force the firm to make a hasty decision. R. Doc. 53 at 8. Furthermore, KKTL points out that Hamilton did not explicitly mention that the MMA Exclusion would be included in the 24-25 Renewal Policy despite expressly asking for approval of similar changes in the policy's exclusion schedule in past email exchanges. R. Doc. 53-12 at 13. KKTL thus maintains that Hamilton's communications cannot be considered an appropriate written notification of the MMA Exclusion. In opposition, Hamilton asserts that any delay in sending over the renewal's proposed terms was due to KKTL's failure in sending the required application for the policy. R. Doc. 56. Furthermore, Hamilton notes that in KKTL's insurance quote that it sent to Synergy, Hamilton stated: "Please read carefully as terms and conditions of coverage may differ from those requested." R. Doc. 53-12. Additionally, Hamilton informed KKTL throughout the 24-25 Renewal Policy's binder that: "This endorsement changes the policy. Please read it carefully." R. Doc. 19-1 at 17. On this basis, Hamilton asserts that KKTL was adequately informed of the MMA Exclusion.

While the Court acknowledges the parties' briefing on this issue, no depositions have been taken at this stage in the proceedings and limited documentation has been submitted in support of these arguments. Accordingly, the Court ultimately concludes that it is not prepared to rule on summary judgment with respect to the adequacy of Hamilton's notice regarding the MMA Exclusion at this time. The Fifth Circuit has recognized that federal district courts have considerable discretion in *sua sponte* denying issues on summary judgment as premature. *Gabarick v. Laurin Mar. (Am.), Inc.*, 406 F. App'x 883, 890 (5th Cir. 2010); *Sunbelt Sav., FSB Dall., Tex. v. Montross*, 923 F.2d 353, 358 (5th Cir. 1991); *Young v. Collin Coll.*, No. 4:24-CV-

00979-SDJ-BD, 2025 WL 1921926, at *1 (E.D. Tex. Apr. 16, 2025), *report and recommendation adopted*, No. 4:24-CV-00979-SDJ-BD, 2025 WL 1919485 (E.D. Tex. July 11, 2025). This is because "[s]ummary judgment assumes some discovery," and thus, such motions should not "ordinarily be granted before discovery has been completed." *Brown v. Miss. Valley State Univ.*, 311 F.3d 328, 333 (5th Cir. 2002); *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979).

Here, the Court notes that there are outstanding discovery matters that must be explored before conclusively deciding whether a genuine issue of material fact exists with respect to the adequacy of Hamilton's written notice of the MMA Exclusion to KKTL. For instance, a key aspect of this case is the fact that Hamilton, as a surplus lines insurer, did not communicate directly with KKTL but rather vis-à-vis the firm's two insurance brokers, Synergy and Assured. It is the Court's understanding that the use of brokers in negotiating insurance policies is ubiquitous in the surplus lines context, and Louisiana law seems to suggest that it is required.[7] In any event, this fact is essential because the Court is essentially being asked here to assess the adequacy of Hamilton's communications, not with KKTL, but with Synergy and Assured—the entities responsible as learned intermediaries to report back to KKTL regarding coverage negotiations.

Notably, the parties' briefing and evidence attached in support is sparse with respect to Synergy and Assured's role in communicating the MMA Exclusion to KKTL. This is confounding given KKTL alleges in its briefing that it never even received the 24-25 Renewal Policy from its brokers before the contract became binding. R. Doc. 54-3 at 20 n.10 ("Of course, KKTL could not have inspected the 2024-25 Policy because it never received it."). At oral argument, the Court

---

[7]    "Surplus lines insurance, as defined in R.S. 22:46, may be procured from a surplus lines insurer, as defined in R.S. 22:46, and *shall be procured through a licensed surplus lines broker*. It may be procured without regard to the availability of coverage from authorized insurers." LA. REV. STAT. § 22:432 (emphasis added).

attempted to remedy this deficiency in information by asking what happened during the 36-hour period between when Hamilton sent the renewal terms to Synergy and Assured and when Hamilton eventually received a binding application from KKTL finalizing the 24-25 Renewal Policy. The parties seemed to indicate, however, that those facts were still entirely unknown, noting that they have yet to take any depositions in this matter.

This is problematic given that witness testimony could shed some light on both the part that the brokers had to play regarding the adequacy of Hamilton's MMA Exclusion notice as well as provide much needed context for the limited email communications evincing the renewal negotiations at issue here. But as it stands now, the lack of factual development and lingering questions involving Synergy and Assured are concerning to the Court. Without a more comprehensive understanding of how the various parties' communications unfolded in this transaction, a premature analysis could result in an erroneous finding or substantial confusion. The Court, and the parties, will benefit from more discovery and context before reaching a final decision on summary judgment as to whether Hamilton's communications fulfilled the written notice requirement contained in La. R.S. § 22:41.1. *See Gabarick*, 406 F. App'x at 890.

### iv. Whether KKTL May Seek Reformation as a Remedy Is Unclear at This Time

Separately, the Court observes that whether KKTL may even seek reformation of the 24-25 Renewal Policy as a remedy based on Hamilton's alleged non-compliance with La. R.S. § 22:41.1 is seriously in question.[8] As Hamilton points out in its briefing, the Fifth Circuit has held that Louisiana law allows for reformation of a contract only where a movant can prove "by clear and convincing evidence [] that a mutual mistake has been made." *Weyerhaeuser Co. v. Burlington*

---

[8]    La. R. S. § 22:41.1 provides that an insurer who fails to provide written notice of a reduction in coverage is subject to penalties or fines; there is notably no mention of contract reformation as an appropriate remedy in the statute.

*Ins. Co.*, 74 F.4th 275, 288 (5th Cir. 2023) (quoting *Motors Ins. Co. v. Bud's Boat Rental, Inc.*, 917 F.2d 199, 203 (5th Cir. 1990)). In this case, KKTL has not made any allegations that the MMA Exclusion constituted a "mutual mistake" between the firm and Hamilton in its answer or briefing. Rather, it simply relies on the *Gaylord Container* case for the proposition that reformation is available in this context. 807 So. 2d at 873.

The Court notes, however, that at least one Louisiana federal district court has rejected a similar argument to the one made by KKTL here, finding that *Gaylord* was inapposite and factually distinct from the facts in that case. *See, e.g.*, *Colony Ins. Co. v. Neal's Cypress Inn, L.L.C.*, No. 04-282, 2006 WL 8432115, at *3 (M.D. La. Jan. 13, 2006). But unlike *Colony*, the Court does not have the benefit of the complete context regarding the parties' communications. As such, the Court finds that it is not prepared at this time to conduct a fact-to-fact comparative analysis between the present case and *Gaylord* to determine whether reformation is truly available to KKTL on this basis. Therefore, the Court chooses to reserve its ruling on this issue as well and will allow the parties to re-urge it once substantial discovery has been completed. *See Gabarick*, 406 F. App'x at 890.

### b. 23-24 Policy's Multiple Claims Provision

Next, the Court will address KKTL's argument that the Underlying Class Action Lawsuit falls under the Multiple Claims Provision contained in the 23-24 Policy.

### i. Interpretation of Insurance Policies under Louisiana Law

Under Louisiana law, courts use the general rules of contract interpretation to construe insurance policies. *See Trinity Indus., Inc. v. Ins. Co. of N. Am.,* 916 F.2d 267, 269 (5th Cir.1990) (citing *Breland v. Schilling,* 550 So. 2d 609, 610 (La. 1989)). The parties' intent, as reflected by the words of the policy, determines the extent of coverage. *Ledbetter v. Concord Gen.*

*Corp.,* 665 So. 2d 1166, 1168 (La. 1996). Unless the words have acquired a technical meaning, their intent is to be determined by their general, plain, and popular meaning. LA. CIV. CODE art. 2047. Courts must consider the policy as a whole and interpret it to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry. *See Trinity Indus.,* 916 F.2d at 269.

If the wording of the policy is ambiguous, then it should be construed to effect, not deny, coverage. *See Yount v. Maisano,* 627 So. 2d 148, 151 (La. 1993). In other words, ambiguous provisions must be strictly construed against the insurer, though not to such a degree that the language of the policy is perverted. *Reynolds v. Select Props., Ltd.,* 634 So. 2d 1180, 1183 (La. 1994); *Com. Union Ins. Co. v. Advance Coating Co.,* 351 So. 2d 1183, 1185 (La. 1977); *see also FDIC v. Barham,* 995 F.2d 600, 603 (5th Cir. 1993). Of course, one cannot use the "perversion of the words or the exercise of inventive powers to create an ambiguity where none exists." *Zeitoun v. Orleans Par. Sch. Bd.*, 2009-1130 (La. App. 4 Cir. 3/3/10), 33 So. 3d 361, 368, *writ denied*, 10-0752 (La. 6/4/10), 38 So. 3d 303; *see also Q Clothier New Orleans LLC v. Twin City Fire Ins. Co.*, 535 F. Supp. 3d 574, 518 (E.D. La. 2021) ("When the language in question is unambiguous, the court 'lack[s] authority to alter the terms of insurance contracts under the guise of contractual interpretation.'") (citations omitted). An insurance policy should not be interpreted in an unreasonable or strained manner to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or to achieve an absurd conclusion. *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 763 (La. 1994); *Fertitta v. Palmer*, 211 So. 2d 282, 285 (La. 1968).

Furthermore, when a contract's terms are clear and unambiguous, a court cannot consider extrinsic evidence to vary the plain language of the policy. *Cajun Conti LLC v. Certain*

*Underwriters at Lloyd's, London*, 359 So. 3d 922, 929 (La. 2023) (holding a party "cannot alter the terms of an insurance contract under the guise of contractual interpretation when the policy uses unambiguous terms."); *Sosebee v. Steadfast Ins. Co.*, No. 09-4138, 2013 WL 2555460, at *5 (E.D. La. June 10, 2013) ("Because this language is clear on its face, the Court will not look to extrinsic evidence to interpret it."). Indeed, if the words of the policy are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent, and the agreement must be enforced as written. *Smith*, 611 So. 2d at 1379; *Central La. Elec. Co. v. Westinghouse Elec. Corp.*, 579 So. 2d 981, 985 (La. 1991); *Pareti v. Sentry Indem. Co.*, 536 So. 2d 417, 420 (La. 1988); *see* LA. CIV. CODE art. 2046.

In light of these contract interpretation principles, KKTL contends that the terms of the 23-24 Policy unambiguously require Hamilton to cover the Underlying Class Action Lawsuit because the Representatives' claims fall under that contract's Multiple Claims Provision. R. Doc. 53 at 13-17. The Court, however, must decline to rule on summary judgment with respect to this issue for the reasons stated below.

### ii. Whether the 23-24 Policy Is an Enforceable Contract Must Be Decided Before Reaching the Merits of the Multiple Claims Provision Argument

The Multiple Claims Provision in the 23-24 Policy specifically states:

> All "claims" for "damages" or "defense costs" arising out of "professional services" to the same person or entity will be deemed to have been made on the date on which the first of all such logically or causally connected "claims" is made against any "insured."

> For the purposes of this insurance, all "wrongful acts" that are logically or causally connected by any common fact, circumstance, situation, transaction, event, service, advice or decision, will be considered to be one "wrongful act" and will be deemed to have taken place at the time the first of these related "wrongful acts" took place.

> All "claims" based upon such logically or causally connected "wrongful acts" shall be deemed to constitute a single "claim" and be subject to a single each claim Limit of Insurance.

R. Doc. 54-5 at 6. Based on its interpretation of this language, KKTL argues that the Underlying Class Action Lawsuit constitutes a single claim with the earlier-filed Wagner Lawsuit that Hamilton already agreed to cover under the 23-24 Policy. R. Doc. 53 at 13-17. More specifically, KKTL contends that both cases involve the same person or entity and arise from logically or causally connected wrongful acts involving the firm's joint representation with MMA of hurricane-affected property owners in Louisiana. *Id.* This is crucial because if the Underlying Class Action Lawsuit retroactively falls under the Multiple Claims Provision as argued such that the 23-24 Policy applies and not the 24-25 Renewal Policy, then the MMA Exclusion would no longer be a hindrance, and Hamilton would be required to provide coverage. *Id.* To be sure, there is no dispute that the MMA Exclusion was not included in the 23-24 Policy.

However, the Court finds it preferable to withhold any ruling on summary judgment with respect to the Multiple Claims Provision due to the nature of Hamilton's opposition. *See Gabarick*, 406 F. App'x at 890. Hamilton has indicated that it plans to "assert its own recission claim for false statements in the [insurance] application by Krause that affected the acceptance of the risk." R. Doc. 57 at 15 (citing LA. REV. STAT. § 22:860). Specifically, it takes the position that KKTL knowingly failed to identify the potential for its exposure to claims brought against it as a result of its joint representation of clients with MMA in both its 23-24 Policy and 24-25 Renewal Policy applications. *Id.* In such a scenario, Louisiana law provides that a policy is *void ab initio* where an insured, like KKTL, intentionally misrepresents a key fact in order to secure insurance. *Mazur v. Gaudet*, 826 F. Supp. 188, 193 (E.D. La. 1992) (emphasis added) ("[A]n insurance policy is void ab initio if a material 'oral or written misrepresentation . . . is made with the intent to deceive' or

if it would have affected the insurer's decision whether to proceed with the arrangement or the rate charged."); *see also F.D.I.C. v. Duffy*, 835 F. Supp. 307, 315 (E.D. La. 1993), *aff'd*, 47 F.3d 146 (5th Cir. 1995) (granting of summary judgment affirmed for insuring finding that policy void due to negative answer to application question regarding knowledge of prior acts within scope of coverage).

Accordingly, the Court concludes it would be premature to conclusively interpret the 23-24 Policy's Multiple Claims Provision to mean that Hamilton is required to cover the Underlying Class Action Lawsuit where the enforceability of the contract itself is still in question.[9] *See, e.g.*, *Dugan L. Firm v. Kurtzman Carson Consultants, LLC*, No. CV 21-1106, 2023 WL 358786, at *3 (E.D. La. Jan. 23, 2023) (first addressing issues of contract formation before reaching interpretation question). The Court will require the parties to engage in more discovery on this issue and assert the rescission claims with more detail and briefing before reaching the merits of the 23-24 Multiple Claims Provision argument. Indeed, the Court observes that whether KKTL truly misrepresented its position by failing to report its involvement with the MMA Controversy in both the insurance applications to Hamilton is a threshold matter that must be dealt with first before reaching the nuanced questions of contractual interpretation.

## V.    CONCLUSION

Considering the foregoing;

**IT IS HEREBY ORDERED** that both Hamilton's Motion for Summary Judgment, R. Doc. 50, and KKTL's Cross Motion for Summary Judgment, R. Doc. 54, are **DENIED** without prejudice. The parties shall have 70 days from the issuance of this order to re-assert their respective

---

[9]      This reasoning equally applies to the question of whether Hamilton's communications regarding the 24-25 Renewal Policy complied with the written notification requirement under La. R. S. § 22:41.1 and is thus yet another justification for postponing the Court's ruling with respect to that issue.

motions after conducting the requisite discovery needed to more appropriately present their arguments to the Court.

New Orleans, Louisiana, this 28th day of August, 2025.

_____

United States District Judge